**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KAREEM EADDY,** | : | |
| *Petitioner* | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **SUPERINTENDENT THERESA DELBALSO,** | : | |
| *et al.,* | : | **NO. 19-0450** |
| *Respondents* | : | |

## MEMORANDUM

PRATTER, J.                                                    FEBRUARY 26, 2024

Kareem Eaddy was convicted of first-degree murder and sentenced to life imprisonment after a trial that was tainted by serious constitutional violations. The Commonwealth of Pennsylvania and Mr. Eaddy agree: Mr. Eaddy did not receive the effective assistance of counsel and was deprived of evidence to which he was constitutionally entitled. After careful review of this case and of the Magistrate Judge's Report and Recommendation, the Court grants Mr. Eaddy's petition for a writ of habeas corpus.

### BACKGROUND

Christopher Lomax was shot outside a bar in the early morning hours of June 22, 2008. Mr. Lomax was celebrating his birthday that night with his friend Tyree Graham. At some point that night, there was a quickly diffused altercation between Mr. Lomax and another individual. Later, as Mr. Lomax left the bar with Mr. Graham, someone shot Mr. Lomax multiple times, killing him.

The Commonwealth of Pennsylvania prosecuted Mr. Eaddy based on the theory that he was both the individual who got into an altercation with Mr. Lomax and the one who shot Mr.

1

Lomax. The Government's case relied on the testimony of six witnesses, none of whom testified to seeing the shooting itself.

The first witness, Mr. Graham, testified that Mr. Eaddy was not the person who got into an altercation with Mr. Lomax and that he did not see who shot Mr. Lomax. Mr. Graham recalled hearing gunshots while outside the bar, running to his car, and looking back to see Mr. Lomax lying on the ground.

The next two witnesses, Kwame Mapp and Jahmil Miller, were Mr. Graham's friends. Neither was present at the bar when the shooting occurred, but they both testified that Mr. Graham told them he saw Mr. Eaddy shoot Mr. Lomax. Mr. Mapp was unable to recall when Mr. Graham had made this accusation and did not inform the police about this accusation until October 2008, about four months after the shooting.

The next three witnesses were at the bar on the night Mr. Lomax was shot. Darnell Clark was at the bar to celebrate Mr. Lomax's birthday and testified that he saw Mr. Lomax bump into someone on the way to the dance floor. Mr. Clark could not hear what was said, but he felt he needed to intervene based on their body language. He testified that he and Mr. Graham separated Mr. Lomax and the other individual, who Mr. Clark described as five foot nine inches tall, about one hundred forty-five pounds, and in his thirties. In June 2008, Mr. Eaddy was five foot seven inches tall, one hundred ninety pounds, and twenty-three years old.

A few months later, the police approached Mr. Clark with a photo array containing a photograph of Mr. Eaddy. Mr. Clark testified that, while several of the photos resembled the individual who bumped into Mr. Lomax inside the bar the night Mr. Lomax was shot, he selected Mr. Eaddy's photo because Mr. Eaddy was the "most familiar." Mr. Clark also testified that he did not recognize anyone in the courtroom who was at the bar the night Mr. Lomax was shot.

2

The Government's next witness, Renee Smith, testified that she was at a different bar the night Mr. Lomax was shot. When the Government confronted her with an alleged statement that she gave to the police in which she described the shooting and identified Mr. Eaddy as the shooter, Ms. Smith adamantly denied either giving that statement or knowing any of the facts it contained. She explained that, though she had accompanied a detective to the police station in March 2009, she had only gone because the detective threatened to arrest her if she did not comply. Ms. Smith's alleged statement was not signed.

Like Ms. Smith, the Government's next witness, Lakia Bunch, also testified that she was not at the bar when Mr. Lomax was shot and denied giving the statement attributed to her by the police. Ms. Bunch explained that she was pregnant at the time and only came to the bar for about twenty minutes to wish her friend (not Mr. Lomax) a happy birthday. Just like Ms. Smith, when Ms. Bunch was confronted with statements she allegedly gave to the police, which reflected that she had witnessed Mr. Eaddy shoot Mr. Lomax, Ms. Bunch denied making the statement. She also explained that the signature and initials on each page were not her own.

The Government called Detective Ronald Dove and Assistant District Attorney James Berardinelli next to rehabilitate the credibility of Ms. Bunch's alleged statement. Detective Dove explained that he had sat in on Ms. Bunch's interview and observed another detective transcribe her statements verbatim. According to Detective Dove, Ms. Bunch reviewed and corrected that statement. Mr. Berardinelli testified that Ms. Bunch told him she did not want to testify because she was scared for her family, even though she had witnessed the shooting. Ms. Bunch adamantly denied saying this in her own testimony.

Finally, the Government presented evidence about Mr. Eaddy's arrest on July 28, 2008, about one month after Mr. Lomax died. When two patrol officers asked Mr. Eaddy, who was sitting

3

on the steps of a house, whether he lived there, Mr. Eaddy "cursed" at them. The officers exited their vehicle and approached Mr. Eaddy, who ran away. One of the officers testified that he saw Mr. Eaddy pull out a gun during the pursuit, which he observed Mr. Eaddy drop when he tripped over a railing. Mr. Eaddy was eventually apprehended, and the officers recovered the gun Mr. Eaddy allegedly dropped. A ballistics expert confirmed that the casings from the bar where Mr. Lomax was shot matched this gun.

The jury asked the presiding judge several questions during its deliberations and specifically requested the alleged statements of Ms. Smith and Ms. Bunch to review. The jury found Mr. Eaddy guilty of all counts: first-degree murder, burglary, possessing an instrument of crime, and three violations of the Uniform Firearms Act. He was sentenced to an aggregate term of life imprisonment.

In his direct appeal, Mr. Eaddy raised seven claims for relief: (1) the evidence was insufficient to sustain his convictions; (2) the murder conviction was against the weight of the evidence; (3) the trial court erred in denying his suppression motion; (4) the trial court erred in granting the motion to consolidate his burglary and murder cases; (5) the trial court erred in overruling an objection to the prosecution impeaching its own witness; (6) the trial court erred in determining that defense counsel offered "opening door" testimony; and (7) the trial court erred in allowing the prosecution to exceed the scope of cross-examination and bolster witness testimony. The Pennsylvania Superior Court rejected all of these arguments, some on the basis of waiver and the rest on the merits. The Pennsylvania Supreme Court and the United States Supreme Court declined Mr. Eaddy's requests for further review, and his conviction became finalized. During the pendency of Mr. Eaddy's direct appeal, but unbeknownst to Mr. Eaddy, Detective Dove was fired from the Philadelphia Police Department for serious misconduct.

Mr. Eaddy collaterally attacked his conviction by filing a petition pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA"). It appears that Mr. Eaddy first became aware of Detective Dove's misconduct and termination from a newspaper article, which Mr. Eaddy attached to his first PCRA petition. Mr. Eaddy's court-appointed counsel filed an amended petition, which requested an evidentiary hearing. This request was denied, and the petition was dismissed. Mr. Eaddy tried to appeal the denial of four ineffective assistance of trial counsel claims, one ineffective assistance of direct appeal counsel claim, and one after-discovered evidence claim relating to the misconduct of Detective Dove. The Superior Court affirmed the lower court's dismissal, and the Pennsylvania Supreme Court denied Mr. Eaddy's petition for leave to appeal.

Mr. Eaddy next sought relief in federal court by filing a petition for a writ of habeas corpus. The Court stayed Mr. Eaddy's federal petition while he litigated a second PCRA petition. The PCRA court denied Mr. Eaddy's second PCRA petition, which brought a single ineffective assistance of trial counsel claim for failure to object to the trial court's reasonable doubt jury instruction. The Pennsylvania Superior Court quashed Mr. Eaddy's appeal because his second PCRA petition was premature.

While his state post-conviction petitions were pending, the Federal Community Defender was appointed to represent Mr. Eaddy in his federal proceedings. The stay was lifted upon completion of Mr. Eaddy's PCRA appeals, and counsel filed a memorandum of law in support of Mr. Eaddy's petition for a writ of habeas corpus.

Because Detective Dove, who had testified at Mr. Eaddy's trial, was involved in previously undisclosed misconduct, the Commonwealth voluntarily provided Mr. Eaddy with discovery on this subject. This discovery revealed that Detective Dove failed to cooperate with, and lied during

the course of, departmental investigations, displayed little or no regard for his responsibilities as a police officer, and engaged in felonious criminal behavior as a detective. One illustration of Detective Dove's misconduct involved the improper, 47-hour detention of an individual in a homicide investigation, during which Detective Dove prevented her from arranging childcare and gave her inadequate food and drink. In Mr. Eaddy's case, Detective Dove had authenticated the alleged statement of Ms. Bunch, which she vehemently denied giving, and the initials and signatures upon that alleged statement, which Ms. Bunch insisted were not her own.

Mr. Eaddy was granted permission to file an amended petition for a writ of habeas corpus based on the evidence provided by the Commonwealth. The Commonwealth argued that Mr. Eaddy was entitled to an evidentiary hearing, which was held on September 29, 2022. Ms. Bunch was the sole witness at that evidentiary hearing.

Following this evidentiary hearing, the Commonwealth argued that Mr. Eaddy is entitled to a writ of habeas corpus due to three key errors at trial: (1) trial counsel's failure to object to the trial court's reasonable-doubt instruction, which substantially lowered the Commonwealth's burden of proof; (2) trial counsel's failure to object to the admission of Ms. Smith's later-recanted identification as substantive evidence; and (3) the failure to disclose Detective Dove's misconduct, which amounts to a violation of due process. The Court agrees and grants Mr. Eaddy's petition for a writ of habeas corpus.

## LEGAL STANDARD

### I.    The Writ of Habeas Corpus

The writ of habeas corpus may be granted to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Typically, in order to qualify for federal habeas relief, a petitioner must first exhaust remedies available to him under state law. *See* 28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541

U.S. 27, 29 (2004). To satisfy this exhaustion requirement, a federal habeas petitioner must demonstrate that the claims at issue have been "fairly presented to the state courts," *Castille v. Peoples*, 489 U.S. 346, 351 (1989), which means that the "factual and legal substance" of the petitioner's claims must be presented "to the state courts in a manner that puts them on notice that a federal claim is being asserted," *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999). This requirement is satisfied by "invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Pennsylvania, this involves the presentation of the federal claim to the Superior Court on direct or collateral review. *Lambert v. Blackwell*, 387 F.3d 210, 233–34 (3d Cir. 2004).

If the petitioner fails to exhaust, his federal claim is procedurally defaulted and generally unreviewable in federal court. *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000); *McCandless*, 172 F.3d at 260. The federal court is also barred from granting habeas relief when a state court relies upon "a state law ground that is independent of the federal question and adequate to support the judgment." *Nolan v. Wynder*, 363 F. App'x 868, 871 (3d Cir. 2010). When a claim has been procedurally defaulted, the petitioner can overcome that procedural default and present the federal claim to the federal court if he can establish "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

When considering the merits of a habeas petitioner's claims, the Court is prohibited from granting habeas relief unless the underlying state-court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state-court decision is "contrary to" clearly established federal law under § 2254(d)(1) "if it 'applies a rule that contradicts the governing law set forth' in Supreme Court precedent, or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different' from that reached by the Supreme Court." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013) (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A decision qualifies as an "unreasonable application" of clearly established federal law under § 2254(d)(1) only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents . . . ." *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 476 (3d Cir. 2017). Unreasonably applying federal law is not equivalent to incorrectly applying federal law; "a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000). The Supreme Court has clarified that the question is "whether the state court's application of clearly established federal law was *objectively* unreasonable." *Williams*, 529 U.S. at 409 (emphasis added).

The Court presumes that any factual determinations made by the state courts are correct, "unless the petitioner rebuts the 'presumption of correctness by clear and convincing evidence.'" *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 264 (3d Cir. 2019) (quoting *Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004)); *see* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

8

## II.    Ineffective Assistance of Counsel

The Constitution guarantees a criminal defendant "the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Crucially, this constitutional right includes "the right to the *effective* assistance of counsel." *Garza v. Idaho*, 139 S. Ct. 738, 743–44 (2019) (emphasis added) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To demonstrate counsel's ineffectiveness pursuant to the test announced in *Strickland*, a defendant must demonstrate: "(1) that counsel's representation fell below an objective standard of reasonableness, and (2) that any such deficiency was prejudicial to the defense." *Id.* at 744 (internal citations and quotation marks omitted) (quoting *Strickland*, 466 U.S. at 692).

When evaluating counsel's performance under the first prong of *Strickland*, courts must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Strickland*, 466 U.S. at 689. When assessing whether counsel's deficiency was prejudicial to the defense under the second prong of *Strickland*, the Court considers whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome[,]" considering "the totality of the evidence before the judge or jury." *Id.* at 694–95.

When a federal habeas court considers ineffective assistance of counsel claims that have already been adjudicated by state courts, the federal court is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). This means that "both the state court and the defense attorney [are given] the benefit of the doubt" by the federal court. *Burt v. Titlow*, 571 U.S. 12, 15 (2013). The question is not simply "whether counsel's actions were reasonable," but rather "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

### III.    Due Process and *Brady v. Maryland*

The government violates a criminal defendant's constitutional due process rights by suppressing evidence that is favorable to the defense and material to the question of guilt. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Favorable evidence may be either exculpatory or impeachment evidence. *Wearry v. Cain*, 577 U.S. 385, 392–93 (2016). Evidence only qualifies as "material" if it sufficiently "undermines confidence in the verdict." *Id.* at 392 (internal quotation marks omitted) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). However, a defendant need not demonstrate that it is "more likely than not" he would have been acquitted if the undisclosed evidence had been admitted. *Id.* (quoting *Smith*, 565 U.S. at 75). And the good or bad faith of the government is irrelevant to determining whether a due process violation has occurred. *Brady*, 373 U.S. at 87. Finally, the government's disclosure obligations under *Brady* remain in full force throughout the direct appeal process, after which the conviction is finalized. *See Dist. Attorney's Office for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68–69 (distinguishing defendant's due process rights during direct appeal from defendant's due process rights during post-conviction, concluding *Brady* disclosure obligations do not extend to latter); *Fields v. Wharrie*, 672 F.3d 505, 515 (7th Cir. 2012) ("[A] prosecutor's *Brady* . . . obligations remain in full effect on direct appeal and in the event of retrial because the defendant's conviction has not yet become final, and his right to due process continues to demand judicial fairness.").

### DISCUSSION

Mr. Eaddy raises seven grounds for relief in his petition for a writ of habeas corpus. The Court grants his petition based on three of those claims: (1) ineffective assistance of trial counsel for failure to object to the trial court's reasonable doubt instruction; (2) ineffective assistance of trial counsel for failure to object to the admission of Ms. Smith's unsigned statement as substantive

evidence; and (3) a violation of Mr. Eaddy's due process rights based on the Commonwealth's failure to disclose evidence of Detective Dove's misconduct.

The Commonwealth concedes that Mr. Eaddy is entitled to relief on these claims. After independently assessing the merits of Mr. Eaddy's habeas claims, *see Wharton v. Vaughn*, 371 F. Supp. 3d 195, 200 (E.D. Pa. 2019) ("Multiple district courts have . . . refused to blindly accept a state's concession of habeas relief."), the Court agrees that Mr. Eaddy is entitled to relief and grants his petition for a writ of habeas corpus.

## IV.    Reasonable Doubt Instruction

Mr. Eaddy argues that an illustrative example contained within the trial court's reasonable-doubt instruction to the jury significantly lowered the prosecution's burden of proof. The trial court inserted the following into Pennsylvania's standard reasonable-doubt instruction:

> Ladies and gentlemen, think about reasonable doubt in this way. I'm very fortunate because I get to talk to each one of you. It's the nature of the selection process that I get to talk with each one of you. I know that each one of you has somebody in your life that you love; a spouse, a significant other, a grandchild, a sibling, a niece or nephew. Each one of you loves somebody.
>
> If you were told that your precious one had a life-threatening illness and that the only possibility for dealing with that life-threatening illness was a surgery, now you probably would say, hold on, wait a minute. Let me get a second opinion. Let me get a third opinion. If you're like me, you're going to research everything you humanly can; what is this illness, what are the protocols for treating this illness, and probably pick up the phone and call everybody you know who has anything to do with health care. What do you know? Tell me. I got to make a decision.
>
> At some point the question will be called. If you go forward with the surgery, it's not because you have moved beyond all doubt. There are no guarantees. If you go forward, it is because you have moved beyond all reasonable doubt.

Feb. 8, 2011 Trial Tr., at 136:22–137:25. Because this jury instruction unconstitutionally lowered the Commonwealth's burden of proof, violating Mr. Eaddy's Fifth Amendment due process rights

and his Sixth Amendment right to a fair trial, Mr. Eaddy argues that his trial counsel was ineffective for failing to object to it.

### A. **Procedural Default and _Martinez_**

As a threshold matter, the Court must determine whether it can consider the merits of this claim in light of the doctrine of procedural default. Mr. Eaddy filed two PCRA petitions. His first did not include this claim. Recognizing the omission, Mr. Eaddy raised this claim in his second PCRA petition, which he filed *pro se* while his first petition was pending on appeal. Although the PCRA court adjudicated this ineffective assistance of trial counsel claim on the merits, the Superior Court quashed Mr. Eaddy's second PCRA petition, finding that the PCRA court should have dismissed the petition as either prematurely filed or, alternatively, as untimely. The Superior Court relied on state-law grounds to determine that Mr. Eaddy's second PCRA petition should have been dismissed on procedural grounds. *See Commonwealth v. Johnson*, No. 1335 EDA 2019, 2020 WL 4882457, at *2-3 (Pa. Super. Ct. Aug. 20, 2020). Because the Superior Court dismissed Mr. Eaddy's second PCRA petition on procedural grounds, the ineffective assistance of trial counsel claim contained within it is procedurally defaulted. In other words, the Pennsylvania courts did not review this claim on the merits but dismissed it on procedure, so the Court would ordinarily be precluded from considering it.

Mr. Eaddy can overcome this procedural default because he can demonstrate both "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court explained that the ineffective assistance of state post-conviction counsel could establish cause to excuse the procedural default of an ineffective assistance of trial counsel claim. *Martinez*, 566 U.S. at 17. To establish cause under *Martinez*, the petitioner must show: (1) the underlying ineffective assistance of trial counsel claim is "substantial," and (2) the procedural default of that substantial claim was

the result of state post-conviction counsel's ineffectiveness. *See Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019).

Mr. Eaddy's ineffective assistance of trial counsel claim is substantial. In this context, "substantial" means that the claim has "some merit," meaning that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* at 937–38 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). Mr. Eaddy's ineffective assistance of trial counsel claim earns the right to proceed further. Because the underlying claim is ineffective assistance of trial counsel, the principles of *Strickland* guide this preliminary substantiality inquiry, though a full analysis of the merits of Mr. Eaddy's claim is unnecessary at this stage. *See Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 377 (3d Cir. 2018) (citing *Miller-El*, 537 U.S. at 336). Trial counsel's failure to object to the same problematic jury instruction that is at issue here has already been found to constitute deficiency under the first prong of *Strickland*. *See, e.g., Moore v. Rivello*, No. 20-838, 2022 WL 1749250, at *13 (E.D. Pa. May 31, 2022); *Brooks v. Gilmore*, No. 15-5659, 2017 WL 3475475, at *6 (E.D. Pa. Aug. 11, 2017). In fact, habeas relief has been granted in this district on the basis of that deficiency. *Moore*, 2022 WL 1749250, at *22; *Brooks*, 2017 WL 2475475, at *10. Thus, Mr. Eaddy's claim is substantial.

Mr. Eaddy's ineffective assistance of trial counsel claim was defaulted due to PCRA counsel's ineffectiveness. When assessing whether collateral review counsel's representation was effective for *Martinez* purposes, the Court is again guided by the test set out in *Strickland*. *See Workman*, 915 F.3d at 937. However, instead of the traditional prejudice prong, the petitioner only needs to show that the underlying claim is substantial. *Id.* at 939–41. Because the Court has

already determined that Mr. Eaddy's ineffective assistance of trial counsel claim is substantial, the Court need only consider whether the performance by PCRA counsel was deficient.

The Court finds that PCRA counsel's representation of Mr. Eaddy "fell below an objective standard of reasonableness . . . ." *Garza*, 139 S. Ct. at 744. "[W]hen there is simply no rational basis to believe that counsel's failure to argue the . . . issue on appeal was a strategic choice," counsel performed deficiently. *Richardson v. Superintendent Coal Township SCI*, 905 F.3d 750, 763 (3d Cir. 2018) (internal quotation marks omitted) (alteration in original) (quoting *United States v. Mannino*, 212 F.3d 835, 844 (3d Cir. 2000)). An unconstitutional reasonable-doubt instruction that lowers the Government's burden in a criminal case is "a structural error requiring automatic reversal if raised on direct appeal." *Moore*, 2022 WL 1749250, at *8 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 281–82 (1993)). Given the extreme importance of accurately instructing the jury on the Government's burden of proof in a criminal case, there is "simply no rational basis" for concluding that PCRA counsel's failure to raise this structural error in Mr. Eaddy's first PCRA petition was a strategic choice. Indeed, PCRA counsel himself conceded that he may have provided ineffective assistance by failing to raise this claim, which underscores the Court's conclusion that this failure could not reasonably have been a strategic choice.

Thus, Mr. Eaddy satisfies both prongs of *Martinez*: his ineffective assistance of trial counsel claim is substantial, and state post-conviction counsel was ineffective when he failed to raise that substantial claim in Mr. Eaddy's initial PCRA petition. The procedural default of his underlying ineffective assistance of trial counsel claim is excused.

### B. **Standard of Review**

Ordinarily, "[o]nce procedural default is excused, 'our review of a petitioner's claim is de novo because the state court did not consider the claim on the merits.'" *Workman*, 915 F.3d at 943 (quoting *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 236 (3d Cir. 2017)). In this case,

although the claim was procedurally defaulted when the Superior Court found Mr. Eaddy's second PCRA petition to be untimely, the PCRA court had already considered and rejected the ineffective assistance of trial counsel claim contained in Mr. Eaddy's second PCRA petition. Though the Superior Court held that the PCRA court lacked jurisdiction to consider that claim on the merits, it also wrote in a footnote: "[i]f we had jurisdiction to reach [Mr. Eaddy's] underlying claim of ineffective assistance of trial counsel, we would find it lacked merit for the reasons expressed in the PCRA court's opinion." *Johnson*, 2020 WL 4882457, at *3 n.4 (Pa. Super. Ct. Aug. 20, 2020). The Third Circuit Court of Appeals has applied a deferential standard of review to a state court's alternative merits ruling after determining that the state court's initial procedural ruling did not bar consideration of the claim. *See Rolan v. Coleman*, 680 F.3d 311, 319–21 (3d Cir. 2012). Thus, out of both respect for the principle of comity and an abundance of caution, the Court reviews this claim under the deferential standard of review enumerated in §2254, namely whether the PCRA court's decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

### C. The Unconstitutional Reasonable-Doubt Instruction

When the Court evaluates a jury instruction, it examines the language of the instruction "in its totality" to "determin[e] whether the instructions correctly captured the applicable legal concepts." *Baxter v. Superintendent Coal Township SCI*, 998 F.3d 542, 548 (3d Cir. 2021); *see also United States v. Thayer*, 201 F.3d 214, 221 (3d Cir. 1999) (quoting *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995) ("When jury instructions are challenged, 'we consider the totality of the instructions and not a particular sentence or paragraph in isolation.'"), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). The Court is required to "ascertain how a reasonable jury would have interpreted the instructions at issue." *Tyson v. Superintendent Houtzdale SCI*, 976 F.3d 382, 392 (3d Cir. 2020) (quoting *Smith v. Horn*, 120 F.3d 400, 413 (3d

Cir. 1997)). Although most courts, including courts in Pennsylvania, generally follow standard proposed jury instructions, "no particular set of words is mandated." *United States v. Isaac*, 134 F.3d 199, 202 (3d Cir. 1998) (citing *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)).

"If an instruction contains a defect, other language in the instruction that correctly explains the law might not serve to cure the error, especially where the correct language merely contradicts and does not explain the defective language." *Moore*, 2022 WL 1749250, at *7 (quotation marks omitted) (quoting *Bey*, 856 F.3d at 241). This skepticism of ambiguity is appropriate "because, given our cultural and legal adherence to the sanctity of the jury deliberations, 'a reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.'" *Id.* (quoting *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 285 (3d Cir. 2018)).

For a reasonable-doubt instruction to be defective, there must be "a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009) (internal quotation marks omitted) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). Reasonable doubt is a "*fair* doubt based 'upon reason,' common sense, or experience 'rather than whim, possibilities[,] or supposition." *Moore*, 2022 WL 1749250, at *8 (quoting *United States v. Hernandez*, 176 F.3d 719, 728 (3d Cir. 1999)). It is neither proof beyond all doubt, *see Dunbar v. United States*, 156 U.S. 185, 199 (1895), proof to a "mathematical certainty," *Holland v. United States*, 348 U.S. 121, 138 (1954), nor equivalent to either "grave uncertainty" or "actual substantial doubt," *Cage v. Louisiana*, 498 U.S. 39, 41 (1990), *overruled on other grounds by Estelle*, 502 U.S. at 72 n.4. The standard instead requires the jury "to reach a subjective state of near certitude of the guilt of the accused . . . ." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). If the reasonable-

16

doubt instruction fails to make this clear, this constitutes structural error of constitutional

magnitude that requires automatic reversal when raised on direct appeal. *Sullivan*, 508 U.S. at 281.

At the end of Mr. Eaddy's trial, the judge began instructing the jury about the

Government's reasonable-doubt burden as follows:

> The Commonwealth bears the burden of proving the elements of
> each and every one of the crimes charged beyond a reasonable
> doubt. The citizen who was accused of a crime does not have to
> present evidence. Although he did, he was not required to. They
> don't have to prove anything in their own defense.

> If the evidence presented fails to meet the Commonwealth's burden,
> then your verdict must be not guilty. On the other hand, if the
> Commonwealth has met its burden, if the Commonwealth has
> proven beyond a reasonable doubt that [Mr. Eaddy] is guilty of the
> crimes charged, then your verdict should be guilty.

> Let's talk about this burden. What is it because I know you have all
> heard the term your entire life, proof beyond a reasonable doubt.
> Ladies and gentlemen, it is the highest burden in the law. There is
> nothing greater. And it is the Commonwealth's burden, but the
> Commonwealth is not required to prove its case beyond all doubt.
> The Commonwealth is not required to meet some mathematical
> certainty. Nor is the Commonwealth required to demonstrate the
> impossibility of innocence.

> A reasonable doubt is a doubt that would cause a reasonably careful
> and sensible person to pause, to hesitate, to refrain from acting upon
> a matter of the highest importance to their own affairs, to their own
> interests. A reasonable doubt must fairly arise out of the evidence
> that was presented or the lack of evidence that was presented with
> respect to some element of each of the crimes.[1]

---

[1] For comparison, the relevant section of the standard Pennsylvania instruction reads as follows:

> It is not the defendant's burden to prove that he is not guilty. Instead, it is
> the Commonwealth that always has the burden of proving each and every
> element of the crime charged and that the defendant is guilty of that crime
> beyond a reasonable doubt. The person accused of a crime is not required
> to present evidence or prove anything in his or her own defense. If the
> Commonwealth's evidence fails to meet its burden, then your verdict must
> be not guilty. On the other hand, if the Commonwealth's evidence does
> prove beyond a reasonable doubt that the defendant is guilty, then your
> verdict should be guilty.

Feb. 8, 2011 Trial Tr., at 135:10–136:21. Following this initial description of the Government's

burden, the judge deviated from the standard instructions and inserted her own example to illustrate

the concept of reasonable doubt:

> Ladies and gentlemen, think about reasonable doubt in this way. I'm
> very fortunate because I get to talk to each one of you. It's the nature
> of the selection process that I get to talk with each one of you. I
> know that each one of you has somebody in your life that you love;
> a spouse, a significant other, a grandchild, a sibling, a niece or
> nephew. Each one of you loves somebody.
>
> If you were told that your precious one had a life-threatening illness
> and that the only possibility for dealing with that life-threatening
> illness was a surgery, now you probably would say, hold on, wait a
> minute. Let me get a second opinion. Let me get a third opinion. If
> you're like me, you're going to research everything you humanly
> can; what is this illness, what are the protocols for treating this
> illness, and probably pick up the phone and call everybody you
> know who has anything to do with health care. What do you know?
> Tell me. I got to make a decision.
>
> At some point the question will be called. If you go forward with the
> surgery, it's not because you have moved beyond all doubt. There
> are no guarantees. If you go forward, it is because you have moved
> beyond all reasonable doubt.

*Id.* at 136:22–137:25. Finally, the trial judge closed by returning to Pennsylvania's standard jury

instructions:

> Ladies and gentlemen, a reasonable doubt must be a real doubt. It
> cannot be a doubt that is manufactured to avoid carrying out a

---

Although the Commonwealth has the burden of proving that the defendant
is guilty, this does not mean that the Commonwealth must prove its case
beyond all doubt and to a mathematical certainty, nor must it demonstrate
the complete impossibility of innocence. A reasonable doubt is a doubt
that would cause a reasonably careful and sensible person to hesitate
before acting upon a matter of importance in his or her own affairs. A
reasonable doubt must fairly arise out of the evidence that was presented
or out of the lack of evidence presented with respect to some element of
the crime.

*Presumption of Innocence—Burden of Proof—Reasonable Doubt*, Pa. Suggested Standard
Crim. Jury Instructions § 7.01 (3d ed. 2019) (cleaned up).

> significant responsibility. Ladies and gentlemen, you may not find
> [Mr. Eaddy] guilty based upon a mere suspicion of guilt. The
> Commonwealth's burden is to prove [Mr. Eaddy] guilty beyond a
> reasonable doubt. If the Commonwealth has met that burden, then
> [Mr. Eaddy] is no longer presumed to be innocent and you should
> find him guilty. On the other hand, if the Commonwealth has not
> met its burden, then you must find him not guilty.[2]

*Id.* at 138:1–14.

The life-threatening illness instruction, which the trial judge inserted into Pennsylvania's

standard instructions in Mr. Eaddy's trial, has been found unconstitutional in recent years by

several courts in this district. *See, e.g.*, *Brooks*, 2017 WL 3475475, at *3–5; *Moore*, 2022 WL

1749250, at *7–11; *Vando v. Clark*, 652 F. Supp. 3d 509, 514–16 (E.D. Pa. 2023). Some courts

have disagreed, finding that the life-threatening illness instruction satisfies due process. *See, e.g.*,

*Bey v. Kauffman*, No. 19-2127, 2020 WL 5775932, at *17 (E.D. Pa. July 15, 2020), *report and*

*recommendation adopted by* 2020 WL 5763550 (E.D. Pa. Sept. 28, 2020); *Gant v. Giroux*, No.

15-4468, 2017 WL 2825927, at 14–15 (E.D. Pa. Feb. 27, 2017), *report and recommendation*

*adopted by* 2017 WL 2797911 (E.D. Pa. June 28, 2017), *vacated and remanded in light of*

*Commonwealth's concession*, Order, No. 17-2559 (3d Cir. Sept. 4, 2018). Because the Third

Circuit Court of Appeals has not addressed the constitutionality of this life-threatening illness

---

[2]     For comparison, the relevant section of the standard Pennsylvania instruction reads as follows:

> A reasonable doubt must be a real doubt; it may not be an imagined one,
> nor may it be a doubt manufactured to avoid carrying out an unpleasant
> duty. So, to summarize, you may not find the defendant guilty based on a
> mere suspicion of guilt. The Commonwealth has the burden of proving the
> defendant guilty beyond a reasonable doubt. If it meets that burden, then
> the defendant is no longer presumed innocent and you should find him
> guilty. On the other hand, if the Commonwealth does not meet its burden,
> then you must find him not guilty.

*Presumption of Innocence—Burden of Proof—Reasonable Doubt*, Pa. Suggested Standard Crim. Jury
Instructions § 7.01 (3d ed. 2019) (cleaned up).

instruction, *see Baxter*, 998 F.3d at 547 n.5, the Court fulsomely explained why it finds the direction unconstitutional in *Moore*, 2022 WL 1749250, at *9–11.

To summarize: the life-threatening illness instruction unconstitutionally lowers the Commonwealth's burden by encouraging the jury, through an emotionally laden hypothetical, to *act* in the face of doubt instead of instructing the jury to *hesitate* in the face of doubt, even though the Supreme Court has made its preference for the latter clear. *See id.* at *9–10; *Holland*, 348 U.S. at 140. Although the problematic hypothetical here was sandwiched between passages reflecting the standard definition of reasonable doubt, it is constitutionally intolerable that the Court "has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Id.* at *7 (quoting *Bennett*, 886 F.3d at 285). Furthermore, the Commonwealth has both continued to distance itself from this instruction generally and has conceded that the instruction is unconstitutional in Mr. Eaddy's case. *Cf. id.* at *10–11 (noting the Commonwealth's identical concession in Mr. Moore's case). Finally, it is important to separate the strength of the evidence from the constitutionality of a jury instruction. *Cf. Corbin v. Tice*, 2021 WL 2550653, at *3 (E.D. Pa. June 22, 2021) (considering strength of evidence in weighing jury instruction). A faulty reasonable-doubt instruction is structural error. *Sullivan*, 508 U.S. at 281. Though the strength of the evidence may be relevant to evaluating an ineffective assistance of counsel claim under *Strickland*, it is utterly irrelevant when assessing a jury instruction for compliance with due process.

Thus, the Court finds that the trial judge's reasonable-doubt instruction was unconstitutional.

### D. The PCRA Court's Decision was Contrary to Clearly Established Federal Law

The Pennsylvania Superior Court did not engage with the merits of Mr. Eaddy's ineffective assistance of trial counsel claim, but the PCRA court rejected that claim on the merits, and the

Superior Court wrote that it agreed with the PCRA court's analysis. The mere unconstitutionality of the trial court's reasonable-doubt instruction therefore does not automatically entitle Mr. Eaddy to relief under § 2254, which requires the Court to consider whether the PCRA court's approval of the reasonable-doubt instruction was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

In approving the trial court's life-threatening illness instruction, the PCRA court began by emphasizing that the instruction was book-ended by "language essentially identical to the suggested jury charge . . . ." *Commonwealth v. Johnson*, No. CP-51-0010355, at 10 (Philadelphia Court of Common Pleas Sept. 27, 2019) (*Johnson II*). Though the PCRA court identified the importance of assessing the constitutionality of the challenged instruction in the context of the trial court's entire charge, it curiously quoted just the following passage from the trial court's charge: "You will probably research the illness. You will research the people who handle this, the hospitals. If you are like me, you will call everyone who you know who has anything to do with medicine in their life. Tell me what you know." *Id.* Although this language bears some family resemblance to the instruction given at Mr. Eaddy's trial, the language quoted by the PCRA court *does not appear* in the transcript of Mr. Eaddy's trial. *See* Trial Tr. of Feb. 8, 2011 at 137:6–19. Having invoked a few sentences that bear some resemblance to one part of the trial court's unconstitutional reasonable-doubt instruction, the PCRA court summarily concluded that "in the context of the entire charge," this "example . . . did not elevate the level of doubt needed to acquit the defendant." *Johnson II*, No. CP-51-0010355, at 10.

The Supreme Court has long made clear that courts reviewing jury instructions for constitutional error must "consider how reasonable jurors could have understood the charge *as a*

whole." *Cage*, 498 U.S. at 41 (emphasis added) (citing *Francis v. Franklin*, 471 U.S. 307, 316 (1985)); *see Estelle v. McGuire*, 502 U.S. 62, 72 (1991) ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole . . . .") (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)); *accord Sullivan*, 508 U.S. at 277 (explaining most important element of Sixth Amendment right to trial by jury to be "the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.'") (citing *Sparf v. United States*, 156 U.S. 51, 105–06 (1895)). Although the PCRA court accurately noted its obligation to consider the entire charge, it unreasonably applied that directive of federal constitutional law. There is "no possibility fairminded jurists could disagree" that the PCRA court's summary quotation of a *different* charge than the one at issue in Mr. Eaddy's case "conflicts with [the Supreme] Court's precedents," which require reviewing courts to consider the whole charge actually given to the jury. *Mathias*, 876 F.3d at 476.

At a minimum, a court reviewing an allegedly unconstitutional jury instruction must analyze the jury instruction that was actually given in the case at hand. Even if the PCRA court had accurately quoted the reasonable-doubt instruction in Mr. Eaddy's case, though, its narrow focus on language which arguably illustrates the PCRA court's proposition that "compelling evidence would be needed to go forward" would be an unreasonable application of the requirement to consider the jury charge as a whole. *Johnson II*, No. CP-51-0010355, at 10. This analysis neglects to consider, for example, that the unconstitutional jury instruction invites the jury to search for compelling evidence to take action in the form of approving surgery—"the only possibility for dealing with [the] life-threatening illness" of a spouse, significant other, grandchild, sibling, niece, or nephew. Trial Tr. of Feb. 8, 2011 at 1–9. Thus, the Court finds that the PCRA court impermissibly analyzed this jury instruction in doubly "artificial isolation" from its context:

first, the PCRA court quoted artificial language; second, it isolated that language from the emotive context that impermissibly encouraged the jurors in Mr. Eaddy's case to act in the face of doubt. *Estelle*, 502 U.S. at 72.

Thus, the PCRA court unreasonably applied federal law as determined by the United States Supreme Court when it approved the unconstitutional reasonable-doubt instruction in Mr. Eaddy's case.

### E.  Ineffective Assistance of Trial Counsel

The next question for the Court to consider is whether counsel's failure to object to the instruction violated Mr. Eaddy's constitutional right to the effective assistance of counsel. To succeed on this claim, Mr. Eaddy must demonstrate: (1) that trial counsel's representation was deficient and (2) that this representation undermined confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 688, 694. The Court assumes that effective assistance was given to Mr. Eaddy, and he has the burden to prove otherwise. *Burt*, 571 U.S. at 22. Additionally, when the state court addresses the petitioner's ineffective assistance of trial counsel claim, the petitioner must demonstrate that the state court decision "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). Thus, a federal habeas court is "doubly deferential" when reviewing an ineffective assistance of counsel claim because the Court "must give 'the benefit of the doubt' to *both* the state court *and* the petitioner's counsel. *Moore*, 2022 WL 1749250, at *12 (quoting *Burt*, 571 U.S. at 15).

#### 1.  Deficiency

To determine whether trial counsel was deficient, the Court considers whether "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. This assessment requires courts to begin from "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Where "the record does

not explicitly disclose trial counsel's actual strategy or lack thereof," this presumption may be rebutted if the petitioner shows that "no sound [trial] strategy" could have supported trial counsel's course of action. *Lewis v. Horn*, 581 F.3d 92, 113 (3d Cir. 2009) (quoting *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)). The Third Circuit Court of Appeals has recognized that trial counsel's failure to object to a faulty instruction may fall "outside the wide range of reasonable professional assistance." *Tyson*, 976 F.3d at 396 (quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689) ("While we recognize there are 'countless ways to provide effective assistance in any given case,' we cannot fathom a strategic reason for counsel's failure to object to an instruction that eliminates the state's burden to prove an element of a crime that carries a mandatory sentence of life imprisonment.").

Here, the deficiency inquiry centers on trial counsel's failure to object to an unconstitutional jury instruction. Because the PCRA court declined to find Mr. Eaddy's trial counsel ineffective for failing to object, *see Johnson II*, No. CP-51-0010355, at 9, the Court must determine whether the PCRA court "applied *Strickland* to the facts of [Mr. Eaddy's] case in an objectively unreasonable manner." *Woodford*, 537 U.S. at 25.

As an initial matter, the Court re-emphasizes the central role that the concept of reasonable doubt plays in criminal jury trials, which the Court discussed at length in *Moore*, 2022 WL 1749250, at *13–14. The Supreme Court has explained that the reasonable doubt standard "plays a vital role in the American scheme of criminal procedure," symbolizing "the significance that our society attaches to the criminal sanction and thus to liberty itself." *Jackson*, 443 U.S. at 315 (citing *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)). It "gives concrete substance to the presumption of innocence to ensure against unjust convictions." *Id.* This is why a jury instruction that fails to constitutionally charge the jury with the requirement of proof beyond a

reasonable doubt is structural error requiring automatic reversal on direct appeal. *Sullivan*, 508 U.S. at 281–82.

Mr. Eaddy's trial counsel's failure to object to an unconstitutional jury instruction that lowered the Commonwealth's burden of proof could not have been strategic. The hypothetical posed by the trial judge inaccurately illustrated the concept of reasonable doubt and should have been "instinctively problematic" to any defense lawyer, including Mr. Eaddy's trial counsel. *Brooks*, 2017 WL 3475475, at *6–7 ("Given the central importance of the reasonable doubt standard, any prudent criminal defense attorney—let alone one who handles homicides—would have focused sharp attention as soon as the judge deviated from the standard instruction."). The failure of trial counsel to make this critical objection "constituted *Strickland* deficiency" because "[f]ailure to make a 'crucial' or 'critical' objection is deficient where it is 'not . . . the result of reasonable professional judgment.'" *Id.* at *6 (quoting *Strickland*, 466 U.S. at 690); *see also Thomas*, 428 F.3d at 501; *Carpenter v. Vaughn*, 296 F.3d 138, 158 (3d Cir. 2002).

The PCRA court found trial counsel not to be ineffective because "Pennsylvania appellate courts have repeatedly, and without exception, refused to find error in the instruction." *Johnson II*, No. CP-51-0010355, at 9. "Therefore," the PCRA court continued, "counsel cannot be deemed ineffective for failing to raise a *baseless* claim." *Id.* (emphasis added). Given both that Pennsylvania state courts have upheld the constitutionality of the life-threatening illness instruction, *see, e.g.*, *Commonwealth v. Nam*, No. 3641 EDA 2018, 2019 WL 3946049, at *3 (Pa. Super. Ct. Aug. 21, 2019), and some federal district courts have agreed, *see, e.g.*, *Bey*, 2020 WL 5775932, at *17, there is a colorable argument that Mr. Eaddy's trial counsel was not ineffective for failing to anticipate that federal courts would conclude otherwise. However, "such reasoning . . . is a red herring." *Moore*, 2022 WL 1749250, at *15. Although the PCRA court may be correct

that counsel cannot be ineffective for failing to raise a "baseless" claim, the claim that this burden-lowering instruction is unconstitutional has had a basis in Supreme Court precedent for decades. *See Cage*, 498 U.S. at 41 (finding reasonable-doubt instruction unconstitutional in 1991 because it "allow[ed] a finding of guilt based on a degree of proof below that required by the Due Process Clause."). Trial counsel's decision not to make this colorable objection "was not a strategic choice, but a careless blunder." *Moore*, 2022 WL 1749250, at *15. Furthermore, the PCRA court "applie[d] a rule that contradict[ed] the governing law set forth" in Supreme Court precedent by mischaracterizing a valid challenge to the life-threatening illness instruction as "baseless" and dismissing Mr. Eaddy's claim on that fallacious basis. *Eley*, 712 F.3d at 846 (quoting *Williams*, 529 U.S. at 405–06). Though some lower courts have rejected this claim in other cases, the Supreme Court of the United States has long recognized a basis for objecting to burden-lowering reasonable-doubt instructions. *See Cage*, 498 U.S. at 41. It was unreasonable for Mr. Eaddy's trial lawyer not to make that objection when the trial judge deviated from the standard instruction. And it was an unreasonable application of Supreme Court precedent when the PCRA court minimized the gravity of that instruction as "baseless" due to some lower court precedents.

Thus, Mr. Eaddy's trial counsel was deficient, and the PCRA court unreasonably applied federal law as determined by the Supreme Court when it concluded otherwise.

### 2.    Prejudice

Because no state court has considered whether Mr. Eaddy was prejudiced by his trial counsel's failure to object to the unconstitutional reasonable-doubt instruction, the Court considers the prejudice prong of *Strickland* de novo. *See Workman*, 915 F.3d at 943. When considering the prejudice prong, the Court must determine whether there is a "reasonable probability" that, but for counsel's failure to object, "the result of the proceeding would have been different." *Baxter*, 998 F.3d at 547–48 (quoting *Strickland*, 466 U.S. at 694) (conducting prejudice analysis to evaluate

ineffective assistance of counsel claim on habeas review where counsel failed to object to unconstitutional reasonable-doubt instruction). A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In the context of failure to object to an unconstitutional reasonable-doubt instruction, this means there is a reasonable probability that "at least one juror would have harbored a reasonable doubt." *Buck v. Davis*, 580 U.S. 100, 120 (2017). To evaluate whether trial counsel's failure to object has been prejudicial, the Court considers the totality of the evidence. *Strickland*, 466 U.S. at 695.

Mr. Eaddy was prejudiced by the trial court's unconstitutional reasonable-doubt instruction and by his trial counsel's failure to object to it. The Commonwealth's theory at trial was that Mr. Eaddy was both the individual who had an altercation with Mr. Lomax inside the bar and the individual who shot and killed Mr. Lomax outside the bar. To rebut the Commonwealth, Mr. Eaddy's trial counsel centered the concept of "reasonable doubt." Defense counsel's strategy was to poke holes in the Commonwealth's evidence so that the jury would have reasonable doubt about whether Mr. Eaddy was actually the shooter. Defense counsel even listed "at least 12 or more reasonable doubts" for the jury to consider during his closing argument. Moreover, the Commonwealth has conceded that "reasonable doubt played a critical role in the outcome" of Mr. Eaddy's case. Given the centrality of reasonable doubt to Mr. Eaddy's defense, the Court has no difficulty concluding that trial counsel's failure to object to a jury instruction that lowered the standard of reasonable doubt "undermine[s] confidence in the outcome" of Mr. Eaddy's trial. *Id.* at 694.

Not a single witness at Mr. Eaddy's trial testified that they saw Mr. Eaddy shoot Mr. Lomax, and the testimony tying Mr. Eaddy to the murder is not compelling. Mr. Graham consistently denied seeing who shot Mr. Lomax and affirmatively denied that Mr. Eaddy was the

individual who got into an altercation with Mr. Lomax inside the bar. The Commonwealth called two witnesses to rebut Mr. Graham's denial of seeing the shooter, but their credibility was questionable: they both waited months after the shooting to report their information to the police, and one of them, Mr. Miller, did not report this information to the police until he was facing criminal charges. *Johnson*, 179 A.3d at 1110.

Mr. Clark also testified, but he only observed the initial altercation inside the bar, not the shooting outside the bar. Although he eventually identified Mr. Eaddy as the individual who got into an altercation with Mr. Lomax, his identification was equivocal. Months after the incident, when Mr. Clark was presented with a photo array, Mr. Clark explained that several of the photographs resembled the individual who got into an altercation with Mr. Lomax. Eventually, he settled on Mr. Eaddy's photograph because Mr. Eaddy was the "most familiar." Crucially, Mr. Clark testified that he did not recognize anyone in the courtroom during Mr. Eaddy's trial who was at the bar on the night of Mr. Lomax's death.

Finally, the Commonwealth called two witnesses who vehemently denied their presence at the bar on the night in question. The Commonwealth nonetheless insisted that Ms. Smith and Ms. Bunch saw Mr. Eaddy shoot Mr. Lomax. When Ms. Smith and Ms. Bunch were presented with statements that they allegedly gave to the police to that effect, both witnesses denied giving those statements. As discussed below, because Ms. Smith's statement was neither adopted nor signed, it should not have been admitted into evidence in the first place. Moreover, Ms. Bunch adamantly denied that the initials and signature on the statement attributed to her were her own, and subsequent disclosures about the misconduct of Detective Dove raise significant questions about the authenticity of those signatures. Finally, the jury specifically requested to review Ms. Smith's and Ms. Bunch's prior statements during deliberations. Given that these dubious statements were

attributed to the sole eyewitnesses called to testify at trial, it is easy to conclude that Mr. Eaddy's case was "the type of case where reasonable doubt play[ed] a fundamental role." *Brooks*, 2017 WL 3475475, at *8.

The strongest evidence against Mr. Eaddy was his possession, over one month after Mr. Lomax's death, of the gun that was used to shoot Mr. Lomax. As defense counsel argued at trial, guns are not static and can easily be bought or sold or otherwise transferred over the course of a month. Moreover, there is some reason to believe that Mr. Eaddy was unaware of the fact that the gun he possessed had been used in the previous month's shooting. When the police approached him, he provoked them, though he could have simply walked away. As defense counsel argued at trial, it is difficult to understand why Mr. Eaddy would provoke the officers if he knew that the gun he had in his possession was linked to a homicide. Even though the Commonwealth maintains that the gun remains "substantial evidence" of Mr. Eaddy's guilt, it is also "constrained to concede" that this is not enough to overcome Mr. Eaddy's demonstration of *Strickland* prejudice.

In light of all the evidence presented at trial, the Court finds a "reasonable probability" that, but for trial counsel's failure to object to the reasonable doubt instruction, "at least one juror would have harbored a reasonable doubt." *See Buck*, 580 U.S. at 119–20.

Mr. Eaddy is entitled to a writ of habeas corpus based on his ineffective assistance of trial counsel claim for failure to object to the unconstitutional reasonable-doubt instruction.

## V.    Ms. Smith's Unsigned Statement

Mr. Eaddy argues that his trial counsel was ineffective for failing to object to the admission of Ms. Smith's unsigned statement into evidence. After Ms. Smith denied on the stand that she witnessed the shooting of Mr. Lomax, the Commonwealth confronted Ms. Smith with a statement she allegedly gave the police describing the shooting. As the prosecutor read each sentence from the alleged statement aloud, Ms. Smith repeatedly denied providing that information to the police

or knowing the details the statement contained. Significantly neither the alleged statement nor the subsequent identification of Mr. Eaddy contained Ms. Smith's signature. However, the trial court and the Commonwealth both told the jury that they could consider the alleged prior statement as substantive evidence.

Mr. Eaddy and the Commonwealth contend that trial counsel was ineffective for failing to object to the admission of Ms. Smith's prior statement. The Court agrees.

### A. **Procedural Default and *Martinez***

Mr. Eaddy's claim regarding Ms. Smith's unsigned statement is procedurally defaulted. Because federal courts can only review the merits of habeas claims that have been exhausted in state court, *see Baldwin*, 541 U.S. at 29, and Mr. Eaddy did not present this ineffective assistance of counsel claim in either of his PCRA petitions, the Court concludes that this claim has not been presented through "one complete round of the [Commonwealth's] established appellate review process." *O'Sullivan*, 526 U.S. at 845. Mr. Eaddy attempts to argue that this claim was fairly presented to the Pennsylvania courts in his PCRA petition, which contended that trial counsel was ineffective for failure to object on the basis that Ms. Smith's unsigned statement was improperly authenticated under Pennsylvania's evidence rules. However, to fairly present a claim for exhaustion purposes, a petitioner must submit "the same factual and legal basis" for the federal claim to the state courts. *Nara v. Frank*, 488 F.3d 187, 197–98 (3d Cir. 2007) (citing *Duncan v. Henry*, 513 U.S. 364, 366 (1995)). Though PCRA counsel, in making the authentication argument, referred in passing to a case that is central to the present claim, "the exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record." *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988). Thus, this claim is procedurally defaulted.

The procedural default of Mr. Eaddy's claim can also be excused. As explained above, a petitioner can overcome procedural default under *Martinez* by demonstrating: (1) that the underlying ineffective assistance of trial counsel claim is substantial, and (2) that this claim was defaulted due to PCRA counsel's ineffectiveness. *See Workman*, 915 F.3d at 937. Mr. Eaddy can satisfy both prongs.

Mr. Eaddy's underlying ineffective assistance of trial counsel claim has "some merit" and deserves "encouragement to proceed further." *Id.* Curiously, counsel failed to object to the admission of Ms. Smith's unsigned statement as substantive evidence even though he was aware of the line of governing cases barring admission of the same: counsel explicitly mentioned those cases during a sidebar with the trial judge. Not only did counsel fail to preserve Mr. Eaddy's objection to the entry of this statement, but he also declined the trial judge's invitation to provide her with this favorable authority. Given the substantial weight a jury might afford the putative statement of an eyewitness, there is no discernible strategic reason for refraining to pursue its exclusion. The claim is certainly substantial.

PCRA counsel's ineffectiveness caused the default of this claim. The Court recognizes that there is a "strong presumption" that counsel made a strategic decision to litigate some claims over others, but that presumption can be rebutted "by showing that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Workman*, 915 F.3d at 942 (quoting *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999)). Here, PCRA counsel chose a clearly weaker claim instead of the significant and obvious alternative. The Superior Court easily rejected PCRA counsel's argument that the statement was insufficiently corroborated because there was sufficient testimony from a detective to authenticate Ms. Smith's statement under Pennsylvania's evidentiary rules. *Johnson*, 179 F.3d at 1119. There is no

conceivable strategic reason for failing to make the significantly stronger and obvious claim that Ms. Smith's statement should have been excluded because it was unsigned. *Cf. Commonwealth v. Lively*, 610 A.2d 7, 8 (Pa. 1992) (allowing for admission of prior inconsistent statements as substantive evidence when "reduced to a writing signed and adopted by the declarant[.]"). The fact that trial counsel flagged this line of cases on the record and PCRA counsel still neglected to raise it underscores the ineffectiveness of PCRA counsel.

Thus, there is cause to excuse the procedural default of Mr. Eaddy's ineffective assistance of trial counsel claim for failure to object to the admission of Ms. Smith's unsigned statement as substantive evidence at trial.

### B. <u>Deficiency</u>

Trial counsel performed deficiently by not properly objecting to Ms. Smith's alleged prior statement. Under Pennsylvania's *Brady-Lively* doctrine, Ms. Smith's unsigned prior statement was clearly inadmissible as substantive evidence. In *Brady*, the Pennsylvania Supreme Court began allowing the admission of prior inconsistent statements of non-party witnesses as substantive evidence as long as the declarant was a witness at trial and available for cross-examination. *Commonwealth v. Brady*, 507 A.2d 66, 67, 70 (Pa. 1986). The Pennsylvania Supreme Court then limited the scope of this holding by establishing that only prior inconsistent statements "given under oath at a formal legal proceeding," "reduced to a writing signed and adopted by the declarant," or "recorded verbatim contemporaneously with the making of the statement" were admissible as substantive evidence. *Commonwealth v. Lively*, 610 A.2d 7, 8, 10 (Pa. 1992). Ms. Smith's unsigned prior statement does not fall into any of these categories.

Mr. Eaddy's trial counsel appeared to know that the lack of Ms. Smith's signature prevented the admission of her statement. Outside the presence of the jury, the Commonwealth identified for the court that Ms. Smith's statement was unsigned and that he anticipated Ms. Smith

would deny giving that statement to the police. The Commonwealth planned to walk Ms. Smith through the statement, allow her to deny making the statements it contained, and then to call a detective to testify that the statement was a verbatim recitation what Ms. Smith told detectives. Defense counsel objected on the basis of *Brady* and its progeny. The trial judge explained her belief that the statement could come into evidence so long as Ms. Smith admitted to meeting with the police, but she also told defense counsel that she would consider case law to the contrary.

Despite the trial judge's affirmative invitation to provide the court with binding and favorable case law that would have excluded Ms. Smith's unsigned statement, Mr. Eaddy's trial counsel never followed up. When Ms. Smith took the stand, defense counsel never objected to the identification of the statement. Although he objected when the Commonwealth announced that it would go through the statement line by line, defense counsel failed to preserve the basis of that objection, which was overruled.

The failure of Mr. Eaddy's trial counsel to provide the trial court with binding and favorable authority that would have prevented the admission of Ms. Smith's alleged statement was objectively unreasonable. Her putative eye-witness statement purported to identify Mr. Eaddy as the shooter. Defense counsel tried to prevent the admission of this damaging statement but inexplicably failed to follow up, even though the trial judge explicitly invited him to submit binding and favorable case law that was at his fingertips. Moreover, he failed to preserve the *Brady-Lively* objection. There is no conceivable trial strategy that could support counsel's inaction here, which resulted in the admission as substantive evidence of an inadmissible, putative eyewitness statement identifying Mr. Eaddy as the shooter.

Thus, Mr. Eaddy's trial counsel was deficient for his failure to effectively object to the admission of Ms. Smith's unsigned statement as substantive evidence.

### C. Prejudice

The deficient performance of trial counsel prejudiced Mr. Eaddy. Not a single witness at Mr. Eaddy's trial testified that they saw the shooting. By contrast, Ms. Smith's putative statement, which she denied giving, identified Mr. Eaddy as the individual who shot Mr. Lomax. This unsigned, inadmissible statement was therefore extremely important to the Commonwealth's case against Mr. Eaddy. The significance of this statement is underscored by the fact that the jury requested a copy of Ms. Smith's statement to review during deliberations. The day after the jury reviewed Ms. Smith's statement, which was only admitted due to defense counsel's objectively unreasonable failure to object, the jury returned a verdict of guilty. If Mr. Eaddy's trial counsel had meaningfully objected, there is a reasonable probability that the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694.

Mr. Eaddy is entitled to habeas relief on his ineffective assistance of trial counsel claim based on counsel's failure to object to the admission of Ms. Smith's statement.

### VI.   Detective Dove's Misconduct

The Commonwealth failed to timely disclose the misconduct of Detective Dove, which violated Mr. Eaddy's due process rights under *Brady v. Maryland*. Mr. Eaddy is entitled to habeas relief on this claim.

### A. Exhaustion

Mr. Eaddy did not exhaust this claim in state court, but the Commonwealth has affirmatively waived the exhaustion defense. Mr. Eaddy's first PCRA petition contained a state-law claim concerning Detective Dove's misconduct, but he did not make a federal *Brady* claim. Federal courts are ordinarily barred from reviewing unexhausted claims, but the Commonwealth may waive the exhaustion defense through an express statement by counsel. *See* 28 U.S.C. § 2244(b)(3). The Commonwealth has affirmatively waived the exhaustion defense to Mr. Eaddy's

*Brady* claim, so the Court may review it. *See* Response to Amended Petition at 14 n.3, Doc. No. 41 ("Respondents do not assert and affirmatively waive any procedural bars that would otherwise bar consideration of the merits of the *Brady* claim involving [Detective] Dove").

## B. **Evidentiary Hearing**

Evidence of Detective Dove's misconduct and additional testimony by Ms. Bunch entered the federal habeas record during an evidentiary hearing held on September 29, 2022. A federal court generally cannot hold an evidentiary hearing when "the applicant has failed to develop the factual basis of a claim in State court proceedings," unless "the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). Here, Mr. Eaddy diligently tried to develop the factual record of his claim based on Detective Dove's misconduct. Though the Commonwealth failed to disclose this *Brady* material, Mr. Eaddy attached a newspaper clipping about Detective Dove's misconduct to his PCRA petition, arguing that it constituted after-discovered evidence under state law. However, notwithstanding Mr. Eaddy's diligence, the facts surrounding Detective Dove's misconduct were not discovered until Mr. Eaddy's federal habeas proceedings because the Commonwealth withheld them until then.

The Court recognizes that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record *based on ineffective assistance of state postconviction counsel*." *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022) (emphasis added). Although the Supreme Court has explained that "state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner," *id*, the Commonwealth's failure to comply with its due process obligations under *Brady* cannot properly be attributed to Mr. Eaddy. Because Mr. Eaddy needed the Commonwealth's cooperation to develop this factual predicate, which was not forthcoming until his federal habeas proceedings,

and he nonetheless diligently tried to develop the factual basis for his claim based on Detective Dove's misconduct, the September 2022 evidentiary hearing was proper pursuant to §2254(e)(2). The Court may consider the evidence entered into the record at that hearing.

### C. **Due Process Violation**

Detective Dove was a key witness at Mr. Eaddy's trial because he rehabilitated Ms. Bunch's alleged eyewitness statement. Ms. Bunch denied from the witness stand that she gave the statement to the police, and she denied that the initials and signature upon that alleged statement were her own. Detective Dove then contradicted her, stating that he had sat in on Ms. Bunch's interview and observed another detective transcribe her statements verbatim. According to Detective Dove, Ms. Bunch reviewed and corrected that statement too.

In the words of the Commonwealth, after Mr. Eaddy's trial but before his conviction was final, Detective Dove was fired for "serious misconduct, including lying during the course of a police department investigation." Second Response to Amended Petition at 3, Doc. No. 52 ("Second Response"). However, the Commonwealth did not disclose any information about Detective Dove's misconduct until voluntary discovery took place in the present federal habeas proceedings in 2022. This period of voluntary discovery disclosed that Detective Dove was fired for his failure to cooperate with, and deception during the course of, police department investigations; having little or no regard for his responsibilities as a member of the police department; and engaging in felonious criminal activity. Detective Dove harassed others via text message and abused his authority during the course of investigating a homicide.

This is compelling impeachment evidence against Detective Dove. The Commonwealth's case against Mr. Eaddy relied heavily upon Ms. Bunch's alleged statement: it was one of only two eyewitness supposed identifications implicating Mr. Eaddy as the shooter, and the jury specifically asked for a copy of Ms. Bunch's statement during deliberations. Ms. Bunch's testimony directly

contradicted her alleged statement, and Detective Dove vouched for that statement. Given that Detective Dove's misconduct was extremely relevant to the type of misconduct that would need to occur for the jury to believe Ms. Bunch—namely the fabrication of both her statement and the signatures upon it by the police—this lacking impeachment evidence is sufficient to undermine confidence in the jury's verdict, rendering it "material" under *Brady* and its progeny. *Wearry*, 577 U.S. at 392 (quoting *Smith*, 565 U.S. at 75).

Ms. Bunch's testimony at the 2022 evidentiary hearing underscores that Detective Dove's misconduct undermines confidence in the outcome of Mr. Eaddy's trial. Ms. Bunch explained that she was in custody on an unrelated retail theft charge when homicide detectives brought her to an interrogation room and asked her about the night Mr. Lomax was shot. Ms. Bunch informed the detectives that she had not witnessed the shooting. Although Ms. Bunch recalled acknowledging that she had grown up with Mr. Eaddy, she was adamant that she did not tell the detectives any details about the shooting because she was not there. Contributing to Ms. Bunch's credibility, she also testified that the detectives asked her about her then-boyfriend, who was confirmed to be an erstwhile suspect in Mr. Lomax's homicide by a recent review of the police file.

Ms. Bunch also continued to assert at the evidentiary hearing that the signatures on her alleged statement were not in her handwriting. When Ms. Bunch was presented with both current and past instances of her signature, she confirmed that they were her own.[3] As the Commonwealth

---

[3]     For reference, below is a screenshot from the Commonwealth's response comparing the signatures on the alleged statement with exemplars of Ms. Bunch's actual signature.

now acknowledges, those authentic signatures "facially do not resemble" the putative signatures on her alleged statement to the police. Second Response at 36, Doc. No. 52. Upon review of those signatures side-by-side, the Court agrees that the two sets of signatures do not resemble each other. Combined with both Ms. Bunch's consistent, credible, and repeated denials of giving that statement and Detective Dove's significant history of misconduct involving dishonesty in

---

(fn. 9 con) Signatures from Bunch's purported statement dated 5/11/09:

Signature on Bunch's recent affidavit:    Signature on a notice of appearance dated 9/4/09 found in the homicide file:

Signature on the preliminary hearing subpoena from 2009:

38

investigations, the Court is not confident that the signatures Detective Dove attributed to Ms. Bunch actually belong to her.

Ms. Bunch's testimony was diametrically opposed to that of Detective Dove. The statement attributed to Ms. Bunch by Detective Dove was one of two putative eyewitness statements identifying Mr. Eaddy as Mr. Lomax's shooter. The Commonwealth's failure to disclose Detective Dove's misconduct undermines confidence in the outcome of Mr. Eaddy's trial because the jury was prevented from considering highly probative impeachment evidence against Detective Dove, rendering Ms. Bunch's dubious statement more credible than it is.

Thus, Mr. Eaddy is entitled to habeas relief on his claim of a due process violation based on the Commonwealth's failure to disclose Detective Dove's misconduct.

## CONCLUSION

Mr. Eaddy was convicted of first-degree murder and sentenced to a term of life imprisonment after a trial that was in three-fold "violation of the Constitution . . . of the United States." 28 U.S.C. § 2254. Mr. Eaddy's trial counsel failed to object to an unconstitutional reasonable-doubt instruction, which impermissibly lowered the Commonwealth's burden of proof. Mr. Eaddy's trial counsel also failed to object to the admission of an unsigned statement identifying Mr. Eaddy as the shooter, depriving Mr. Eaddy of an effective lawyer and placing highly prejudicial, inadmissible evidence in front of the jury. Finally, in addition to trial counsel's ineffectiveness, the Commonwealth violated Mr. Eaddy's due process rights by failing to disclose the serious and highly relevant misconduct of a disgraced detective who testified in Mr. Eaddy's case. These errors entitle Mr. Eaddy to a writ of habeas corpus.

The Court grants Mr. Eaddy's petition. The Commonwealth must retry Mr. Eaddy within 180 days or release him. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE